**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

|  |  |
|---|---|
| DODOTS LICENSING SOLUTIONS LLC,<br><br>                              Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD.,<br>SAMSUNG ELECTRONICS AMERICA,<br>INC., BEST BUY STORES, L.P.,<br>BESTBUY.COM, LLC, and BEST BUY<br>TEXAS.COM, LLC,<br><br>                              Defendants. | Case No. 6:22-cv-00535-ADA-DTG<br><br>Jury Trial Demanded |

## AMENDED COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

This is an action for infringement of U.S. Patent Nos. 9,369,545; 8,020,083; and 8,510,407 (the "patents-in-suit"), in which Plaintiff DoDots Licensing Solutions LLC ("DoDots"), makes the following allegations against Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung"), and Best Buy Stores, L.P., Bestbuy.com, LLC and Best Buy Texas.com, LLC (collectively, "Best Buy," or "BBY") (collectively with Samsung, "Defendants"):

### THE PARTIES

1.      DoDots is a Texas limited liability company with a place of business at 32932 Pacific Coast Highway #14-164, Dana Point, CA 92629.

2.      Upon information and belief, Samsung Electronics Co., Ltd. is company organized and existing under the laws of the Republic of Korea, with a principal place of business at 129 Samseong-ro, Yeongtong-gu Gyeonggi-do 16677 Suwon-Shi, Republic of Korea (South).

3.      Samsung Electronics Co., Ltd. operates a wholly owned subsidiary, Samsung Electronics America, Inc. ("SEA"), that has been registered to do business in the State of Texas and has been since at least June 10, 1996.

4.      SEA is a New York corporation with its principal place of business at 85 Challenger Rd., Ridgefield Park, New Jersey 97660. SEA is a wholly-owned subsidiary of Samsung Electronics Co., Ltd. SEA may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

5.      Samsung Electronics Co., Ltd. exercises direction and control over the performance of SEA. Alternatively, Defendants form a joint business enterprise such that the performance by one Defendant is each attributable to the other Defendant.

6.      Samsung has maintained regular and established places of business or offices and/or other facilities in Texas at least at 12100 Samsung Blvd., Austin, Texas 78754; 2800 Wells Branch Pkwy, Austin, TX 78728; 1301 East Lookout Drive, Richardson, Texas 75082; and 6635 Declaration Drive, Plano, TX 75023.

7.      Samsung's products are offered for sale through numerous mobile carriers in this judicial District, including, but not limited to Verizon stores at 2812 W Loop 340 Suite# H-12, Waco, TX 76711; 1820 S Valley Mills Dr, Waco, TX 7671; and 3590 Greenlawn Blvd Suite 103, Round Rock, TX 78664; T-Mobile Stores at 2448 W Loop 340

Suite 24a, Waco, TX 76711 and 208 Hewitt Dr Suite #200, Waco, TX 76712; and AT&T

Stores at 4330 W Waco Dr, Waco, TX 76710; 2320 W Loop 340 #100A, Waco, TX 76711;

and 1515 Hewitt Dr Ste A, Waco, TX 76712 (collectively, "Waco and Austin Carrier

Stores"). On information and belief, Samsung products relevant to the allegations in this

Complaint have been sold and used at the Waco and Austin Carrier Stores, and are

offered for sale at the Waco and Austin Carrier Stores.

8.      Samsung has authorized sellers and sales representatives that offer and

sell accused Samsung products relevant to this Complaint throughout the State of

Texas, including in this District, and to consumers throughout this District, such as: Best

Buy, 4627 S Jack Kultgen Expy, Waco, TX 76706 and 11066 Pecan Park Blvd Ste 300,

Cedar Park, TX 78613.

9.      Defendant Best Buy Stores, L.P. is a corporation organized and existing

under the laws of Virginia with its principal place of business at 7601 Penn Ave South,

Richfield, MN 55423.

10.      Defendant BestBuy.com, LLC is a corporation organized and existing

under the laws of Virginia with its principal place of business at 7601 Penn Ave South,

Richfield, MN 55423.

11.      Defendant Best Buy Texas.com, LLC is a corporation organized and

existing under the laws of Virginia with its principal place of business at 7601 Penn Ave

South, Richfield, MN 55423.

## JURISDICTION AND VENUE

12.     This is an action for infringement of U.S. patent nos. 9,369,545; 8,020,083; and 8,510,407 arising under the patent laws of the United States, Title 35 of the United States Code.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

14.     This Court has personal jurisdiction over Samsung in this action pursuant to due process, Federal Rule of Civil Procedure 4(k)(2)(B), and/or the Texas Long Arm Statute, by virtue of at least the substantial business Samsung conducts in this forum, directly and/or through intermediaries, including but not limited to: (1) having committed acts within the Western District of Texas giving rise to this action and having established minimum contacts with this forum such that the exercise of jurisdiction over Samsung would not offend traditional notions of fair play and substantial justice; (2) having directed its activities to customers in the State of Texas and this District, solicited business in the State of Texas and this District, transacted business within the State of Texas and this District and attempted to derive financial benefit from residents of the State of Texas and this District, including benefits directly related to the instant patent infringement causes of action set forth herein; (3) having placed its products and services into the stream of commerce throughout the United States and having been actively engaged in transacting business in Texas and in this District; and (4) either individually, as members of a common business enterprise, and/or in conjunction with third parties, having committed acts of infringement within Texas and in this District.

4

15.     Samsung has committed and continues to commit acts of infringement in this District directly and through third parties by, among other things, making, selling, advertising (including through websites), offering to sell, distributing, and/or importing products and/or services that infringe the Asserted Patents as defined below.

16.     Samsung has, directly or through its distribution network, purposefully and voluntarily placed infringing products in the stream of commerce knowing and expecting them to be purchased and used by consumers in Texas.

17.     Samsung has committed direct infringement in Texas.

18.      Samsung has committed indirect infringement based on acts of direct infringement in Texas.

19.     Samsung has transacted, and as of the time of filing of the Complaint, continues to transact business within this District.

20.     Samsung derives substantial revenues from its infringing acts in this District, including from its manufacture and sale of infringing products in the United States.

21.     Venue is proper against Samsung Electronics Co., Ltd. in this District pursuant to 28 U.S.C. § 1391(c)(3) because Samsung Electronics Co., Ltd. is a foreign corporation not resident in the United States and venue is proper in any district against a foreign corporation. Venue is proper for Samsung Electronics America, Inc. under 28 U.S.C. § 1400 because SEA (1) has a regular and established place of business in this Judicial District, and (2) has committed and continues to commit acts of patent

infringement in this Judicial District by, *inter alia*, directly and/or indirectly using, selling, or offering for sale, the accused Samsung products discussed below.

22.     Samsung has answered multiple complaints in this District, without contesting Venue and Personal Jurisdiction. For example, Samsung has filed answers in: *Scramoge, Ltd. v. Samsung Electronics Co., Ltd. et al,* 6-21-cv-00454 (W.D. Tex); *Wepay Global Payments LLC v. Samsung Electronics Co., Ltd. et al,* 6-21-cv-01095 (W.D. Tex*);* and *VOIP-PAL.com.Inc. v. Samsung Electronics Co., Ltd et al,* 6-21-cv-01246 (W.D. Tex.).

23.     BBY has committed acts of infringement in this judicial district.

24.     BBY has a regular established place of business in this judicial district at 4627 S. Jack Kultgen Expy, Waco, TX 76706.



25.     On information and belief, the Court has personal jurisdiction over BBY because BBY has committed, and continues to commit, acts of infringement in the state of Texas, has conducted business in the State of Texas, and/or has engaged in continuous and systematic activities in the State of Texas.

26.     On information and belief, BBY's instrumentalities that are alleged herein to infringe were and continue to be used, imported, offered for sale, and/or sold in the Western District of Texas.

27.     BBY has agreed, on multiple occasions, that Best Buy Stores, L.P., BestBuy.com, LLC, and Best Buy Texas.com LLC, all subsidiaries of Defendant Best Buy Co., Inc., were the proper defendants in this district and have agreed to not challenge venue for those defendants. *See, e.g., MV3 Partners, LLC v. Best Buy Co.*, Case No. 18-cv-374 (W.D. Tex.), ECF No. 29 and *NXP USA Inc., v. Mediatek Inc. et al.,* Case No. 21-cv-318, (W.D. Tex.), ECF No. 40 ("Substitute Best Buy Defendants are the proper parties to defend against allegations made in this patent infringement lawsuit.").

## Background

28.     This case arises from groundbreaking technology that the named inventors of the patents-in-suit developed at the turn of the 21st century. At that time, accessing content on the internet generally involved the use of web browsers such as Microsoft's Internet Explorer or Netscape Navigator running on a personal computer or primitive mobile device. Viewing internet content on many devices was hindered by the fact that existing web content and web applications were designed to fit an entire web page displayed on a traditional computer monitor. Many web pages were also slow and difficult to navigate. Various attempts to enhance the traditional web pages, such as the addition of "plug-ins," were equally unsuccessful because they only added to the "mess" of the web page. *See* https://www.forbes.com/forbes/2000/0515/6511334a.html

29.     John Kembel and George Kembel, twin brothers, recognized that there was dissatisfaction with the traditional web browser and that there was a "growing desire for individual users to fully control the aggregation and presentation of content and web applications that appears on a client computer." *See, e.g.,* U.S. patent no. 9,369,545, col. 1, ll. 48-51.

30.     The Kembel brothers are Stanford engineering, business, and design school alumnae. They are the original founders of DoDots, Inc. Since that time, they have created other start-ups that were acquired by leading companies like Oracle Corporation.

31.     In view of this need in the marketplace, the Kembels sought to develop a unique and novel technical solution to a computer-specific process of retrieving and viewing content. The Kembels wanted to eliminate the need for a web browser all together. *See* https://www.forbes.com/forbes/2000/0515/6511334a.html

32.     So, in 1999, the Kembels, along with fellow Stanford graduate student, Tony Medrano, founded DoDots, Inc. in Silicon Valley. They developed a novel approach to delivering content from the internet in the form of connected widgets or applications, called "Dots" rather than via a web browser. Those "Dots," also referred to as "Network Information Monitors," were "fully configurable frame[s] with one or more controls; the frame through which content is optionally presented." *See, e.g.,* U.S. patent no. 9,369,545, col. 4, ll. 56-60.

33.    The Dots used one-tenth of the data that a traditional web page would use, thus allowing for faster loading and display of internet content. *See* Exh. 1 (Business 2.0: "Windows on the World," August 22, 2000).

34.    DoDots, Inc. raised over $20M in funding from leading Silicon Valley venture capital companies such as Softbank, Chase HQ and Merrill Lynch due to strength of their "Dot" technology.

35.    To commercialize this technology, DoDots, Inc. created a system and platform for its businesses and other third-parties to develop such widgets or apps and make them available to desktop and mobile devices. The technology was groundbreaking and revolutionary.

36.    As noted in an article by CNN in April 2000, the DoDots, Inc. technology was the "Web without a browser," and "DoDots is an application made up of small windows called dots. Through these windows, you can take advantage of the features and services offered by certain Web sites without actually visiting them through a browser. Because the dots are small and operate outside the browser, they provide a faster, more direct link to content providers, according to representatives of DoDots, the new Internet company that makes the application. Each dot handles a specific task. 'Essentially, it's a little Web application on your desktop,' says John Kembel, the company's chief technology officer." https://www.cnn.com/2000/TECH/ computing/04/07/dodots.idg/index.html

37.    At its height, DoDots, Inc. employed more than 100 people that were designing, innovating, and selling the DoDots, Inc. technology. *See*

https://www.thefreelibrary.com/Back+to+the+launch+pad%3a+after+a+few+dorman
t+years%2c+tech+entrepreneurs...-a0169825785.

38.     The success of DoDots, Inc. saw it valued at $275 million. The company

listed dozens of customers that had used the technology to distribute their own Dots,

including ABC, Bloomberg, Edmunds, CNET and Merriam-Webster. Seeking to

capitalize on this marketplace adoption, the company evangelized the concept of Dots

and demonstrated the technology to all who would listen, including at conferences

attended by many leading technology companies of today. *See* Exh. 1 (Business 2.0:

"Windows on the World," August 22, 2000).

39.     Indeed, companies like ABC saw the value of the Dot technology and

were extremely excited to partner with DoDots, Inc. As Alan Cohen, executive vice

president of marketing and advertising of ABC stated "In our continuing effort to find

new ways to connect with our audience, the ABC Dot truly stands out as a

revolutionary new communication device…. the ABC Dot will give our viewers a

chance to use their computer desktops in ways they never imagined." The ABC Dot was

used with such popular shows like "Who Wants to be a Millionaire" and "NYPD Blue",

among others. *See* Exh. 2, DoDots, Inc. Press Release, October 2, 2000.

40.     DoDots, Inc. launched and scaled a developer program, cultivating a

community of over 400 independent Dot developers who were deploying Dots and a

base of over 250,000 end-users.

41.     DoDots, Inc. also sought and entered into partnerships with leading

wireless solutions providers such as 2Roam, to expand its reach to the wireless market.

The CEO of 2Roam, Bryan Wargo, stated "DoDots technology is a killer application for wireless devices as it supports the information needs of the on-the-go mobile professional and, like 2Roam, enables users to maintain a constant state with their wireless content or application." And Bob D'Acquisto, 2Roam's director of business development, recognized that "[the DoDots, Inc. technology] gives 2Roam a new and unique way to package and distribute content to [its] customers…it's a win-win for everyone." *See* Exh. 3, DoDots, Inc. Press Release, September 7, 2000.

42.    DoDots, Inc. won back-to-back awards from DemoGod at the DEMO2000 and DEMOMobile 2001 conferences, the leading industry event for disruptive technologies at the time.

43.    DoDots, Inc. was named as an "Investor's Choice" winner at the Technologic Partners' Internet Outlook Conference held in Silicon Valley in September 2000. *See* Exh. 4, DoDots, Inc. Press Release, September 20, 2000.

44.    Unfortunately, when the industry-wide dot com bubble burst, investors withdrew support at a critical stage of its growth, leaving DoDots, Inc. with limited options. Notwithstanding the collapse of DoDots, Inc., the technology it pioneered has been co-opted by numerous companies selling mobile devices, computers, and web applications, including Defendants.

**THE PATENTS-IN-SUIT**

45.    On June 14, 2016, the U.S. Patent and Trademark Office ("USPTO") duly and lawfully issued U.S. Patent No. 9,369,545 (the "'545 Patent"), entitled "Accessing and Displaying Network Content," naming John Albert Kembel, George Andrew

Kembel, Daniel S. Kim, John Russell, Jake Wobbrock, Geoffrey S. Kembel, Jeremy L. Kembel, and Lynn D. Gabbay as inventors.

46.     DoDots is the lawful owner of all right, title and interest in the '545 Patent and has the right to sue and to recover for past infringement of the '545 Patent. A copy of the '545 Patent is attached as Exh. 5.

47.     On September 9, 2020, the USPTO's Patent and Trial Appeal Board ("PTAB") issued a final written decision finding that "Petitioner has not shown by a preponderance of the evidence that claims 1–10 and 12–15 of the '545 patent are unpatentable." Specifically, the PTAB rejected the assertion that any of the challenged claims were invalid as obvious under § 103. The Federal Circuit affirmed the PTAB's decision on December 8, 2021. *See Lenovo Holding Co. v. DoDots Licensing Sols. LLC*, Nos. 2021-1247, 2021-1521, 2021-1580, 2021 U.S. App. LEXIS 36126, at *2 (Fed. Cir. Dec. 8, 2021).

48.     On September 13, 2011, the USPTO duly and lawfully issued U.S. Patent No. 8,020,083 (the "'083 Patent"), entitled "System and Methods for Creating and Authoring Internet Content Using Application Media Packages," naming John Kembel et al. as the inventors.

49.     DoDots is the lawful owner of all right, title and interest in the '083 Patent and has the right to sue and to recover for past infringement of the '083 Patent. A copy of the '083 Patent is attached as Exh. 6.

50.     On January 19, 2021, the PTAB issued a final written decision finding that "claims 1–16 of the '083 patent have not been shown to be unpatentable." Specifically,

the PTAB rejected the assertion that any of the challenged claims were invalid as obvious under § 103. The Federal Circuit affirmed the PTAB's decision on December 8, 2021. *See Lenovo Holding Co. v. DoDots Licensing Sols. LLC*, Nos. 2021-1247, 2021-1521, 2021-1580, 2021 U.S. App. LEXIS 36126, at *2 (Fed. Cir. Dec. 8, 2021).

51.     On August 13, 2013, the USPTO duly and lawfully issued U.S. Patent No. 8,510,407 (the "'407 Patent", collectively with the '545 and '083 patent, the "patents-in-suit"), entitled "Displaying Time-Varying Internet Based Data Using Application Media," naming John Kembel et al. as the inventors.

52.     DoDots is the lawful owner of all right, title and interest in the '407 Patent and has the right to sue and to recover for past infringement of the '407 Patent. A copy of the '407 Patent is attached as Exh. 7.

53.     On January 5, 2021, the PTAB issued a final written decision finding that "Petitioner has not demonstrated by a preponderance of the evidence that any of claims 1, 8–13, and 20–24 are unpatentable." Specifically, the PTAB rejected the assertion that any of the challenged claims were invalid as obvious under § 103. The Federal Circuit affirmed the PTAB's decision on December 8, 2021. *See Lenovo Holding Co. v. DoDots Licensing Sols. LLC*, Nos. 2021-1247, 2021-1521, 2021-1580, 2021 U.S. App. LEXIS 36126, at *2 (Fed. Cir. Dec. 8, 2021).

## Samsung's Pre-Suit Knowledge of the Patents-in-Suit

54.     On information and belief, Samsung was aware of the '545 Patent as late as April 20, 2011. Exh. 8.

55.     On information and belief, Samsung was aware of the '083 Patent as late as April 20, 2011. Exh. 8.

56.     On information and belief, Samsung was aware of the '407 Patent as late as April 20, 2011. Exh. 8.

57.     Persons with knowledge of Samsung's awareness of the Patents-in-Suit include KJ Kim, Samsung's IP counsel.

## Samsung's Infringing Devices and Activities

58.     Defendants make, have made, use, have used, sell, have sold, offer for sale, and/or import into the United States devices including Samsung Galaxy Z Series Mobile Phones, Galaxy S Series Mobile Phones, Galaxy Note Series Mobile Phones, Galaxy A Series Mobile Phones, Galaxy M Series Mobile phones, and Galaxy Tab Series Tablets (collectively, "Accused Samsung Devices").

59.     Additionally, with each device, Samsung launched and continues to operate, use, and sell an operating system customized from the Android OS (*e.g.* Android OS12, OS 11, QOS 10, Pie (9.0),Oreo (8.0), Nougat (7.0), Marshmallow (6.0), Lollipop (5.0), KitKat (4.4), Jellybean (4.3, 4.2 and 4.1), Ice Cream Sandwich (4.0), Honeycomb (3.0), Gingerbread (2.3), Froyo (2.2), Éclair (2.1), Donut (1.6) (collectively, "the Samsung OS") along with other software (*e.g.*, installers, the Play Store app, and the Galaxy App Store app) that are pre-installed or updated on each Accused Samsung Device (the "Accused Samsung Software"). Samsung programmed, customized, preinstalled, and developed the Accused Samsung Software specifically for its Accused

Samsung Devices and is directly responsible for, and has direct control over the use of the Samsung OS along with other software.

60.     Each and every iteration of the Accused Samsung Software is specifically designed by Samsung to cause the Accused Samsung Devices to download applications from an App Store ("Samsung-Supported Apps") in a specific manner. Through these stores various apps can be downloaded for usage on the Accused Samsung Devices. More particularly, Samsung is directly responsible for, and has direct control over, because of the way it programmed and developed the Accused Samsung Software, each and every Accused Samsung Device that is configured to execute the Accused Samsung Software code to obtain Samsung-Supported Apps by transmitting a request to the App Store and receiving the Samsung-Supported App in response to that request.

61.     Moreover, each Samsung-Supported App, which runs on the Accused Samsung Software contains specific information that allows the user experience (including the graphical user interface) of the Samsung-Supported App to be presented on the display of the Accused Samsung Devices.

62.     By making, selling, offering for sale, and importing the Accused Samsung Devices that require the Accused Samsung Software which executes specific code to obtain, install, and use Samsung-Supported Apps, Samsung directly infringes the patents-in-suit. Further, by making, selling, offering for sale, importing, operating, and using the Accused Samsung Software installed and running on the Accused Samsung Devices that require the Accused Samsung Software, which executes specific code to

obtain and utilize Samsung-Supported Apps, Samsung directly infringes the patents-in-suit.

**The Accused Samsung Devices Infringe the '545 Patent**

63.     Samsung directly infringes all of the claims of the '545 patent.

64.     For example, Claim 1 of the '545 patent reads as follows:

(Claim 1 Preamble) A computer-implemented method of obtaining content over a network and displaying the content to a user, the method being implemented in a client computing device in operative communication with a server over a network, the client computing device including electronic storage, a display, and one or more processors configured to execute one or more computer program modules, the method comprising:

(Claim 1 limitation (a)) transmitting a request to the server over the network, the request requesting networked information monitor template;

(Claim 1 limitation (b)) receiving the requested networked information monitor template from the server over the internet, the requested networked information monitor template having been transmitted from the server over the network responsive to the transmitted request, the networked information monitor template comprising:

a definition of a viewer graphical user interface within which content in a web browser-readable language may be presented on the display of the client computing device; and

a definition of a first content element for the networked information monitor template, the definition of the first content element referencing a first network location from which the first content element for the networked information monitor template is served over the network;

(Claim 1 limitation (c)) responsive to instructions included in the requested networked information monitor template, presenting the viewer graphical user interface defined by the networked information monitor on the display of the client computing device separate from and outside of any other graphical user interface that includes user controls for specifying the first network location from which the first content element for the networked information monitor is served over the network;

16

(Claim 1 limitation (d)) responsive to instructions included in the requested networked information monitor template, transmitting over the network a first content request to the first network location referenced by the definition of the first content element for the networked information monitor template;

(Claim 1 limitation (e)) receiving, over the network, the first content element transmitted responsive to the first content request;

(Claim 1 limitation(f)) presenting the received the first content element in the viewer graphical user interface defined by the networked information monitor template, wherein the definition of the viewer graphical user interface and/or the first content element define all controls for enabling a user to interact with the first content element through the viewer graphical user interface.

65.     Samsung infringes each step of the computer-implemented method recited in Claim 1 of the '545 patent because it implements, operates and uses its Accused Samsung Software, which executes specific code to obtain, display and use Samsung-Supported Apps, on its Accused Samsung Devices, which are in operative communication with a server over a network and include electronic storage, a display, and one or more processors configured to execute one or more computer program modules.

66.     First, the preamble of Claim 1 is met because Samsung executes, operates uses, and has direct control over a computer-implemented method of obtaining content over a network (such as the internet) and displaying the content to a user that is implemented on each and every Accused Samsung Device, which are in operative communication with a server over a network and include electronic storage, a display, and one or more processors configured to execute one or more computer program modules:



Source: CNET: "Here's every Galaxy S phone since 2010" accessed at
(https://www.cnet.com/pictures/evolution-history-samsung-galaxy-phones/)

67.     On each of the Accused Samsung Devices, the Accused Samsung

Software, because Samsung directly and specifically programmed it to do so, practices

the claimed method by implementing code on a client computing device (*i.e.*, each

Accused Samsung Device) in operative communication with a server over a network

(such as the internet), the client computing device (*i.e.*, each Accused Samsung Device)

including electronic storage, a display (such as each Accused Samsung Device's screen),

and one or more processors (such as each Accused Samsung Device's processor(s))

configured to execute one or more computer program modules.

68.     Specifically, the Accused Samsung Devices that execute the Accused

Samsung Software have electronic storage, display, and processor that are used to

communication over a wireless network to access the internet, as seen in the product

specifications shown below:



Source: https://news.samsung.com/global/specifications-of-the-galaxy-s-series

69.     Samsung infringes limitation (a) of Claim 1 because the Accused Samsung Software in each and every Accused Samsung Device transmits a request to a server over the network, the request requesting a networked information monitor template. In particular, Samsung programs, executes and uses, and has direct control over the Accused Samsung Software in each and every Accused Samsung Device in a specific and particular manner so that the Accused Samsung Software sends a request to the App Store for an application package (the application package herein is an APK file) to the server over the network and that request requests a networked information monitor template (*e.g.*, APK file, which is a data structure including data structures that constitute the NIM template).

70.    Samsung infringes limitation (b) of Claim 1 because Samsung programmed and executes the Accused Samsung Software in its Accused Samsung Devices to receive the requested networked information monitor ("NIM") template (such as, for example, a Stock app/widget) from a server over the internet, the requested networked information monitor template having been transmitted from a server over the network responsive to the Accused Samsung Software's transmitted request.

71.    Moreover, the Accused Samsung Software requires the APK file for any Samsung-Supported App, which includes a NIM template, to include:

a definition of a viewer graphical user interface within which content (*e.g.,* how and where the graphical user interface presents a stock price)) in a web browser-readable language (such as a xml. or a .json files) may be presented on the display (monitor) of the client computing device (*i.e.,* each Accused Samsung Device); and

a definition of a first content element (incorporating the present price of a stock) for the networked information monitor template, the definition of the first content element referencing a first network location (such as using uniform resource locators) from which the first content element for the networked information monitor template is served over the network.

72.    Specifically, the data structures in APK file for any Samsung-Supported App comprises a definition of a viewer graphical user interface within which content in a web browser-readable language may be presented on the display of the client computing device.

73.    For example, the data structures in APK files for any Samsung-Supported App is used to define a viewer graphical user interface (*e.g.,* a user interface presented on the screen) that may include menus, buttons, and other features. The app resource

contains the files related to the visual presentation of the application, as suggested by the excerpts below.

## App resources

An Android app is composed of more than just code—it requires resources that are separate from the source code, such as images, audio files, and anything relating to the visual presentation of the app. For example, you can define animations, menus, styles, colors, and the layout of activity user interfaces with XML files. Using app resources makes it easy to update various characteristics of your app without modifying code. Providing sets of alternative resources enables you to optimize your app for a variety of device configurations, such as different languages and screen sizes.

Source: https://developer.android.com/guide/components/fundamentals

74.     Additionally, the data structures in APK file for any Samsung-Supported App (*i.e.,* the NIM template) comprises a definition of a first content element for the networked information monitor template, the definition of the first content element referencing a first network location from which the first content element for the networked information monitor template is served over the network.

75.     For example, the data structures in APK file for any Samsung-Supported App comprises a definition of a first content element (for the example of a Stock app, a definition of Stock data (*e.g.,* stock price, daily change, percentage change, other information, etc.) that is displayed on the user interface) referencing a first network location (*e.g.,* a location from which the Stock data may be acquired from the internet) from which the first content is served, as seen in the image below:



76.     Samsung infringes Claim 1, limitation (c) because its Accused Samsung Software in each of its Accused Samsung Devices is responsive to instructions included in the requested networked information monitor template (such as the Stock app/widget), presenting the viewer graphical user interface defined by the networked information monitor on the display (monitor) of the client computing device (*i.e.,* each Accused Samsung Devices ) separate from and outside of any other graphical user interface that includes user controls for specifying the first network location from which the first content element (such as stock price) for the networked information monitor is served over the network.

77.     For example, responsive to (*e.g.,* pursuant to, or as defined by) instructions included in the requested NIM template (*e.g.,* the data structures in APK files associated with the Samsung-Supported Apps), the Accused Samsung Software implemented in each of the Accused Samsung Devices presents the viewer with a graphical user interface defined by the NIM template on the display of the client computing device

(*e.g.*, the user interface presented on the screen of the Accused Samsung Device) as seen in the paragraph above. The user interface includes user controls (*e.g.*, buttons and menus) for specifying the first network location (*e.g.*, a record of a stock price file at a particular web address) from which the first content element for the networked information monitor (*e.g.*, the Stock data displayed in the user interface frame of the app) is served over the network (*e.g.*, over the Internet).

78.     Samsung further infringes Claim 1, limitation (d) because the Accused Samsung Software in each Accused Samsung Device is responsive to instructions included in the requested networked information monitor template, transmitting over the network a first content request to the first network location referenced by the definition of the first content element for the networked information monitor template. Specifically, the Accused Samsung Software implemented in each of the Accused Samsung Devices transmits a request to the first network location (source of the stock market data), as seen in the image below, which shows the results of the Samsung-Supported App pulling information based on a specific watch list.



79.     Samsung further infringes Claim 1, limitation (e) because the Accused Samsung Software in each Accused Samsung Device receives, over the network, the first content element (such as stock price) transmitted responsive to the first content request. For example, responsive to instructions included in the requested networked information monitor template (*e.g.,* responsive to instructions included in the data structures in APK files associated with the Samsung-Supported Apps requested from the Google Play Store or Galaxy App Store), the Accused Samsung Software in each Accused Samsung Device transmits over a network a first content request (*e.g.,* a request for Stock data) to the first network location referenced by the definition of the first content element for the networked information monitor template (*e.g.,* stock data, such as pricing, daily change, percentage change, other information, is served over the Internet).

80.     Finally, Samsung infringes Claim 1, limitation (f) because the Accused Samsung Software in each Accused Samsung Device presents, though the Samsung-Supported Apps, the received first content element (such as stock price) in the viewer graphical user interface defined by the networked information monitor template (such as the data structures in APK file associated with the Stock app/widget), wherein the definition of the viewer graphical user interface and/or the first content element (such as stock price) define all controls for enabling a user to interact with the first content element (such as stock price) through the viewer graphical user interface (such as allowing the user to select specific stocks to track).

81.   For example, the mobile snapshot below discloses different selection features (see details etc.), search menu etc.



### <u>The Accused Samsung Devices Infringe the '083 Patent</u>

82.   The Accused Samsung Devices infringe all of the claims of the '083 patent.

83.   For example, each Accused Samsung Device infringes Claim 1 of the '083 patent, which recites the following limitations:

(preamble) A client device, the client device comprising:

(limitation (a)) electronic storage having stored thereon a plurality of networked information monitor templates defining a plurality of networked information monitors, the plurality of networked information monitor templates comprising a first networked information monitor template defining a first networked information monitor, wherein the first networked information monitor template comprises:

(limitation (b)) a content reference that comprises a network location at which content for the first networked information is accessible via a TCP/IP protocol;

(limitation (c)) a definition of a graphical user interface of the first networked information monitor that lacks controls for manually navigating a network, and that includes a frame within which content received from the network location can be displayed, and frame characteristics defining one or more color, a size, or a position on the electronic display of the frame; and

(limitation (d)) instructions configured (i) to cause the first networked information monitor to request content from the network location in the content reference via the TCP/IP protocol, and (ii) to cause the first networked information monitor to generate the graphical user interface of the first networked information monitor with the content received from the network location via the TCP/IP protocol within the frame;

(limitation (e)) an electronic display; and

(limitation (f)) one or more processors configured to access the first networked information monitor template such that the graphical user interface of the first networked information monitor is presented to a user on the electronic display having content received from the content reference therein.

84.     Specifically, each Accused Samsung Device, such as the ones seen below, meets the preamble of Claim 1 because each is a client device:



Source: CNET: "Here's every Galaxy S phone since 2010" accessed at

(https://www.cnet.com/pictures/evolution-history-samsung-galaxy-phones/)

85.     And each of the Accused Samsung Devices meets limitation (a) of Claim 1 because each Accused Samsung Device has an electronic storage having stored thereon a plurality of networked information monitor templates defining a plurality of networked information monitors, the plurality of networked information monitor templates comprising a first networked information monitor template defining a first networked information monitor. Such electronic storage is shown, for example, by the following breakdown of the Samsung Galaxy S21 that shows flash storage:



Source: https://www.ifixit.com/Teardown/Samsung+Galaxy+S21+Ultra+Teardown/141188

86.     Moreover, the electronic storage of the Accused Samsung Devices is shown to have stored various networked information monitor templates as seen in the image below, which shows an Accused Samsung Devices storing Samsung-Supported Apps, which, as discussed above, are constructed from the data structures in APK files

(NIM templates) that are downloaded to Accused Samsung Devices by the Accused

Samsung Software and placed in electronic storage:



87.     Additionally, each Accused Samsung Device meets limitation (b) of Claim

1 because the electronic storage in each Accused Samsung Device contains the first

networked information monitor template that has a content reference (such as a

uniform resource locator ("URL")) that comprises a network location at which content

for the first networked information (such as stock price data) is accessible via the

TCP/IP protocol employed by the internet. For example, the stock app is able to pull

stock prices from a network location as seen in the image below:



88.     Moreover, each Accused Samsung Device infringes limitation (c) of Claim 1 because a definition of a graphical user interface of the first networked information monitor (such as the graphical user interface of the Stock app) that lacks controls for manually navigating a network, and that includes a frame within which content (such as stock price data) received from the network location can be displayed, and frame characteristics defining one or more color, a size, or a position on the electronic display of the frame.

89.     Specifically, the data structures in APK files associated with Samsung-Supported Apps in each Accused Samsung Device are used to define a viewer graphical user interface (*e.g.*, a user interface presented on the screen) that may include menus,

buttons, and other features. The data structures in APK files associated with Samsung-Supported Apps in each Accused Samsung Device contain the files related to the visual presentation of the application as suggested by Samsung developer guides and seen in the excerpt below:

## App resources

An Android app is composed of more than just code—it requires resources that are separate from the source code, such as images, audio files, and anything relating to the visual presentation of the app. For example, you can define animations, menus, styles, colors, and the layout of activity user interfaces with XML files. Using app resources makes it easy to update various characteristics of your app without modifying code. Providing sets of alternative resources enables you to optimize your app for a variety of device configurations, such as different languages and screen sizes.
Source: https://developer.android.com/guide/components/fundamentals

90.     Additionally, the Accused Samsung Devices infringe limitation (d) of Claim 1 because Samsung-Supported Apps in each Accused Samsung Device include instructions configured (i) to cause the first networked information monitor to request content (such as stock price data) from the network location in the content reference via the TCP/IP protocol, and (ii) to cause the first networked information monitor to generate the graphical user interface of the first networked information monitor with the content (such as stock price data) received from the network location via the TCP/IP protocol within the frame.

91.     Specifically, the NIM template (*e.g.*, the data structures in APK file associated with a Stock app) includes instructions configured to request content from the network location (*e.g.*, address of the server containing the Stock data) via a TCP/IP protocol, as shown by the excerpt below:

# Web-based content

Android offers a variety of ways to present content to a user. To provide a user experience that's consistent with the rest of the platform, it's usually best to build a native app that incorporates framework-provided experiences, such as Android App Links or Search. Additionally, you can use Google Play-based experiences, such as App Actions and Slices, where Google Play services is available. Some apps, however, may need increased control over the UI. In this case, a `WebView` is a good option for displaying trusted first-party content.

Figure 1 illustrates how you can provide access to your web pages from either a browser or your own Android app. The `WebView` framework allows you to specify viewport and style properties that make your web pages appear at the proper size and scale on all screen configurations for all major web browsers. You can even define an interface between your Android app and your web pages that allows JavaScript in the web pages to call upon APIs in your app —providing Android APIs to your web-based application.

Source: https://developer.android.com/guide/webapps.

Notably, this excerpt suggests that Samsung-Supported Apps are able to access web-based content, and on information and belief, such access is through a TCP/IP protocol.

92.     Further, the data structures in APK files associated with Samsung-Supported Apps are used to define a viewer graphical user interface (*e.g.,* a user interface presented on the screen) that may include menus, buttons, and other features. The data structures in APK files associated with Samsung-Supported Apps contain the files defining the visual presentation of the application, as shown by the display of the app below:



93.    Finally, each Accused Samsung Device has an electronic display (such as the Accused Samsung Devices' display, noted in the image below); and one or more processors (highlighted below):



94.    And that processor and display is configured to access the first networked information monitor template such that the graphical user interface of the first networked information monitor is presented to a user on the electronic display having

content (such as stock price data) received from the content reference therein, as exemplified by the images below:



### **The Accused Samsung Devices Infringe the '407 Patent**

95.     The Accused Samsung Devices infringe all of the claims of the '407 patent.

96.     For example, each Accused Samsung Device, satisfies each limitation of Claim 1 of the '407 patent, which recites the following limitations:

(preamble) A client computing device configured to access content over a network, the client computing device comprising:

(limitation a) electronic storage configured to store networked information monitor template associated with a networked information monitor, the networked information monitor template having therein a definition of a viewer graphical user interface having a frame within which time-varying content in a web browser-readable language may be presented on a display associated with the client computing device, wherein the frame of the viewer graphical user interface lacks controls for enabling a user to specify a network location at which content for the networked information monitor is available; and

(limitation b) one or more processors configured to execute one or more computer program modules, the one or more computer program modules being configured to access the networked information monitor defined by the networked information monitor template, wherein accessing the

networked information monitor defined by the networked information monitor template results in:

> (limitation b1) transmission, over a network to a web server at a network location, of a content request for content to be displayed within the frame of the viewer graphical user interface defined by the networked information monitor template;

> (limitation b2) reception, over the network from the web server at the network location, of content transmitted from the web server in response to the content request, the content being time-varying;

> (limitation b3) presentation, on the display, of the viewer graphical user interface defined by the networked information monitor template outside of and separate from any graphical user interface of any other application; and

> (limitation b4) presentation, on the display within the frame of the viewer graphical user interface defined by the networked information monitor, of the time-varying content received from the web server.

97.    Specifically, each Accused Samsung Device meets the preamble because they are client computing devices configured to access content over a network (such as the internet).

98.    And each Accused Samsung Device meets limitation (a) of Claim 1 because it has electronic storage (such as flash memory) configured to store a networked information monitor template associated with a networked information monitor, the networked information monitor template having therein a definition of a viewer graphical interface having a frame within which time-varying content (such as stock price, which varies over time) in a web browser-readable language may be presented on a display (monitor) associated with the client computing device (*i.e.*, each Accused Samsung Device), wherein the frame of the viewer graphical user interface

lacks controls for enabling a user to specify a network location (such as a URL) at which content (such as stock price data) for the networked information monitor is available. Such electronic storage is shown, for example, by the following breakdown of the Samsung Galaxy S21 that shows flash storage:



Source: https://www.ifixit.com/Teardown/Samsung+Galaxy+S21+Ultra+Teardown/141188

99.     And each Accused Samsung Device stores the data structures in APK files associated with the Samsung-Supported Apps from the App store in its internal storage. Specifically, the Accused Samsung Devices store the data structures in APK files associated with Samsung-Supported Apps and their associated data from the App store in its internal storage, as suggested by the image below:



Source: https://www.samsung.com/sg/support/mobile-devices/how-to-free-up-space-on-samsung-mobile-phone-when-it-is-full/

100.    The data structures in APK files for the Samsung-Supported Apps are used to define a viewer graphical user interface (*e.g.,* a user interface presented on the screen) that may include menus, buttons, and other features. The data structures in APK files for each Samsung-Supported App contains the files related to the visual presentation of the application, as suggested by Android developer guides, and seen in the excerpt below:

### App resources

An Android app is composed of more than just code—it requires resources that are separate from the source code, such as images, audio files, and anything relating to the visual presentation of the app. For example, you can define animations, menus, styles, colors, and the layout of activity user interfaces with XML files. Using app resources makes it easy to update various characteristics of your app without modifying code. Providing sets of alternative resources enables you to optimize your app for a variety of device configurations, such as different languages and screen sizes.

Source: https://developer.android.com/guide/components/fundamentals

101.    Moreover, Samsung-Supported Apps, like the Stock app, provide time varying content which is presented on a display associated with the client computing device (*e.g.,* the Accused Samsung Devices), wherein the frame of the viewer's graphical user interface lacks controls for enabling a user to specify a network location (*e.g.,* user

cannot specify the network location) at which content for the networked information monitor is available, as seen in the description from Stock app below that notes a person can track their watchlist but does not permit a person to specify which server from which to obtain stock information.



102.    Additionally, the Accused Samsung Devices meet limitation (b) of Claim 1 because they include one or more processors configured to execute one or more computer program modules, the one or more computer program modules being configured to access the networked information monitor defined by the networked information monitor template, as exemplified by the image below:



103.    The Accused Samsung Devices also meet limitations (b1-b4) of Claim 1 because each Accused Samsung Device includes, implements and uses Accused Samsung Software resulting in transmission, over a network (such as the internet) to a web server at a network location, of a content request (such as a request for stock price data) for content (such as the stock price data) to be displayed within the frame of the viewer graphical user interface defined by the networked information monitor template.



104.    Specifically, limitation (b1) of Claim 1 is met because each of the Accused Samsung Devices transmits a request for that content, as suggested by the screen shot below, which shows a response to a request for a specific stock price:



105.    And limitation (b2) of Claim 1 is met because in response to the request, there is a reception, over the network (such as the internet) from the web server at the network location, of content (such as stock price data) transmitted from the web server in response to the content request (such as the request for stock price data), the content being time-varying (such as stock price, which varies over time). For example, each

Accused Samsung Device receives Stock data (*e.g.*, current price) over the network from the web server at the network location that is time–varying because stock prices are time dependent, as evidenced by the ability to track a watchlist of stocks:



106.    Moreover, limitation (b3) of Claim 1 is met as each Accused Samsung Device presents, on the display monitor/screen), a viewer graphical user interface defined by the networked information monitor template outside of and separate from any graphical user interface of any other application (*i.e.*, the viewer graphical user interface of the Stock app), as seen in the screen shot below:



107.     Finally, limitation (b4) of Claim 1 is met because on each Accused Samsung Device, the presentation, on the display (monitor/screen) within the frame of the viewer graphical user interface, is defined by the networked information monitor (*i.e.*, the viewer graphical user interface of the stock app), of the time-varying content (such as stock price) received from the web server.

### **Best Buy's Infringing activities**

108.     Upon information and belief, Defendant BBY has used, sold, sells, and offers for sale in its stores in this district certain Accused Samsung Devices.

109.     BBY also sold and offered for sale each of the Accused Samsung Devices in this district through its online store, as seen in the image below:



110.     Persons with direct knowledge of BBY's infringement in this District include Alejandro Torrez, a specialty sales manager at Best Buy and Todd Melikan, General Manager of Best Buy Stores in this District.

111.    DoDots will identify additional Accused Samsung Devices pursuant to the Court's scheduling order.

### Samsung's Active Inducement

112.    During the time the Patents-in-Suit were in force and before the filing of this suit, Samsung manufactured, exported, imported, distributed and sold Accused Samsung Devices to its customers which was intended to cause, and did cause, customers to use the Accused Samsung Devices and/or the Accused Samsung Software in the Accused Samsung Devices and directly infringe the Patents-in-Suit. For example, Samsung promoted the use of apps on the Accused Samsung Devices, encouraging users of the Accused Samsung Devices to use apps from Samsung's Galaxy Store, and sold Accused Samsung Devices containing pre-downloaded apps to its customers—including the Galaxy Store app itself. *See, e.g.*, https://www.samsung.com/us/apps/; *see also* https://news.samsung.com/us/samsung-winners-best-of-2018-galaxy-apps-awards-sdc18/; https://news.samsung.com/us/customize-galaxy-devices-galaxy-store/; https://news.samsung.com/us/galaxy-store-goes-all-gaming-fortnite-xbox/; Samsung Electronics Launches Samsung GALAXY Apps – Samsung Global Newsroom; Galaxy J7 2017, Phones Support | Samsung Care US; Manuals & Software | Official Samsung Support US.

113.    As recited, Samsung was aware of the Patents-in-Suit as late as April 20, 2011.

114.    Samsung knew that the use of the Accused Samsung Devices and/or the Accused Samsung Devices together with the Accused Samsung Software would

constitute infringement of the Patents-in-Suit, or believed there was a high probability that the use of the Accused Samsung Devices and/or Accused Samsung Devices together with the Accused Samsung Software would constitute infringement of the Patents-in-Suit and took deliberate steps to avoid learning of that infringement.

## COUNT I – SAMSUNG'S INFRINGEMENT OF THE '545 PATENT

115.    DoDots realleges and incorporates by reference here each of the allegations set forth in the preceding paragraphs.

116.    DoDots owns the entire right, title, and interest in the '545 patent and is entitled to sue for past, current and future infringement.

117.    Samsung directly infringes one or more claims of the '545 patent in violation of 35 U.S.C. § 271 by, at least, implementing, operating, executing and using in the United States, the Accused Samsung Software in each Accused Samsung Device such that the implementation, operation, execution and use of an Accused Samsung Software infringes one or more claims of the '545 patent. For example, Samsung directly infringes, literally or under the doctrine of equivalents, at least claims 1-2, 9-10, 12 and 13 of the '545 patent.

118.    Samsung directly infringes one or more claims of the '545 patent in violation of 35 U.S.C. § 271 by, at least, directly controlling and managing, and having direct responsibility for the implementation, operation, execution and use in the United States of the Accused Samsung Software in each Accused Samsung Device such that the implementation, operation, execution and use of an Accused Samsung Software under Samsung's direct control infringes one or more claims of the '545 patent. For example,

Samsung directly infringes, literally or under the doctrine of equivalents, at least claims 1-2, 9-10, 12 and 13 of the '545 patent.

119.    Samsung directly and indirectly infringes one or more claims of the '545 patent in violation of 35 U.S.C. § 271 by, at least, selling and offering to sell Accused Samsung Devices together with an Accused Samsung Software in the United States — wherein Samsung specifically and intentionally designed and configured each of its Accused Samsung Devices to implement, execute and use an Accused Samsung Software such that the Accused Samsung Software infringes one or more claims of the '545 patent — to its customers which was intended to cause, and did cause, customers to use the Accused Samsung Devices and/or the Accused Samsung Software in the Accused Samsung Devices to directly infringement one or more claims of the Patents-in-Suit. For example, Samsung directly and indirectly infringes, literally or under the doctrine of equivalents, at least claims 1-2, 9-10, 12 and 13 of the '545 patent.

120.    DoDots has not authorized, licensed, or otherwise permitted Samsung to infringe the claims of the '545 patent.

121.    Samsung is on notice of the '545 patent and, despite that notice, continues to infringe the '545 patent.

122.    As a result of Samsung's infringement of the '545 patent, DoDots has suffered damages and will continue to suffer damages.

123.    Samsung is therefore liable to DoDots in an amount that adequately compensates DoDots for Samsung's infringement, which, by law, cannot be less than a

reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. §§ 284-285.

## COUNT II - SAMSUNG'S INFRINGEMENT OF THE '083 PATENT

124.    DoDots realleges and incorporates by reference here each of the allegations set forth in the preceding paragraphs.

125.    DoDots owns the entire right, title, and interest in the '083 patent and is entitled to sue for past, current and future infringement.

126.    Samsung directly and indirectly infringes one or more claims of the '083 patent in violation of 35 U.S.C. § 271 by, at least, making, using, supplying, distributing, importing, exporting, selling and/or offering for sale in the United States the Accused Samsung Devices and/or Accused Samsung Devices together with an Accused Samsung Software in the United States such that each Accused Samsung Device and/or Accused Samsung Software in each Samsung Device, by, at least, specifically and intentionally designing, configuring, making, using, supplying, distributing, importing, exporting, selling and offering to sell each of its Accused Samsung Devices to implement, execute and use each Accused Samsung Device and/or the Accused Samsung Software in each Accused Samsung Device, and by, at least, making, using, supplying, distributing, importing, exporting, selling and offering to sell Accused Samsung Devices to its customers which was intended to cause, and did cause, customers to use the Accused Samsung Devices and/or the Accused Samsung Software in the Accused Samsung Devices to directly infringe one of more claims of the '083

patent. For example, Samsung's Accused Devices, either directly infringe literally or under the doctrine of equivalents, at least claim 1 of the '083 patent.

127.    DoDots has not authorized, licensed or otherwise permitted Samsung to infringe the claims of the '083 patent.

128.    Samsung is on notice of the '083 patent and continues to infringe the '083 patent.

129.    As a result of Samsung's infringement of the '083 patent, DoDots has suffered damages and will continue to suffer damages.

130.    Samsung is therefore liable to DoDots in an amount that adequately compensates DoDots for Samsung's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. §§ 284-285.

## COUNT III - SAMSUNG'S INFRINGEMENT OF THE '407 PATENT

131.    DoDots realleges and incorporates by reference here each of the allegations set forth in the preceding paragraphs.

132.    DoDots owns the entire right, title, and interest in the '407 patent and is entitled to sue for past, current and future infringement.

133.    Samsung is directly and indirectly infringing one or more claims of the '407 patent in violation of 35 U.S.C. § 271 by, at least, making, using, supplying, distributing, importing, exporting, selling and/or offering for sale in the United States the Accused Samsung Devices and/or Accused Samsung Devices together with an Accused Samsung Software in the United States such that each Accused Samsung

Device and/or an Accused Samsung Software in each Samsung Device, by, at least, specifically and intentionally designing, configuring, making, using, supplying, distributing, importing, exporting, selling and offering to sell each of its Accused Samsung Devices to implement, execute and use each Accused Samsung Device and/or the Accused Samsung Software in each Accused Samsung Device, and by, at least, making, using, supplying, distributing, importing, exporting, selling and offering to sell Accused Samsung Devices to its customers which was intended to cause, and did cause, customers to use the Accused Samsung Devices and/or the Accused Samsung Software in the Accused Samsung Devices to directly infringe one of more claims of the '407 patent.. For example, Samsung's Accused Devices directly infringe, literally or under the doctrine of equivalents, at least claim 1 of the '407 patent.

134.    DoDots has not authorized, licensed, or otherwise permitted Samsung to infringe the claims of the '407 patent.

135.    Samsung is on notice of the '407 patent and continues to infringe the '407 patent.

136.    As a result of Samsung's infringement of the '407 patent, DoDots has suffered damages and will continue to suffer damages.

137.    Samsung is therefore liable to DoDots in an amount that adequately compensates DoDots for Samsung's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. §§ 284-285.

### COUNT IV – BBY'S INFRINGEMENT OF THE '083 PATENT

138.     DoDots realleges and incorporates by reference here each of the allegations set forth in the preceding paragraphs.

139.     DoDots owns the entire right, title, and interest in the '083 patent and is entitled to sue for past, current and future infringement.

140.     BBY directly infringes one or more claims of the '083 patent in violation of 35 U.S.C. § 271 by supplying, distributing, importing, exporting, selling and/or offering for sale in the United States the Accused Samsung Devices that read on one or more claims of the '083 patent. For example, the Samsung Accused Devices, directly infringe literally or under the doctrine of equivalents, at least claims 1-8 of the '083 patent.

141.     DoDots has not authorized, licensed or otherwise permitted BBY to infringe the claims of the '083 patent.

142.     As a result of BBY's infringement of the '083 patent, DoDots has suffered damages and will continue to suffer damages.

143.     BBY is therefore liable to DoDots in an amount that adequately compensates DoDots for BBY's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. §§ 284-285.

## COUNT V - BBY'S INFRINGEMENT OF THE '407 PATENT

144.     DoDots realleges and incorporates by reference here each of the allegations set forth in the preceding paragraphs.

145.     DoDots owns the entire right, title, and interest in the '407 patent and is entitled to sue for past, current and future infringement.

146.     BBY is directly infringing one or more claims of the '407 patent in violation of 35 U.S.C. § 271 by, at least using, supplying, distributing, importing, exporting, selling and/or offering for sale in the United States the Accused Samsung Devices that read on one or more claims of the '407 patent. For example, the Accused Samsung Devices directly infringe literally or under the doctrine of equivalents, at least claims 1-12 of the '407 patent.

147.     DoDots has not authorized, licensed or otherwise permitted BBY to infringe the claims of the '407 patent.

148.     As a result of BBY's infringement of the '407 patent, DoDots has suffered damages and will continue to suffer damages.

149.     BBY is therefore liable to DoDots in an amount that adequately compensates DoDots for BBY's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. §§ 284-285.

## JURY DEMAND

150.     DoDots hereby respectfully requests a trial by jury of all issues so triable, pursuant to Rule 38, Fed. R. Civ. P.

## REQUEST FOR RELIEF

WHEREFORE, DoDots respectfully requests the following relief:

A.     A judgment that Samsung has infringed the '545 Patent, the '083 Patent, and the '407 Patent;

B.     A judgment that BBY has infringed the '083 Patent and the '407 Patent;

49

C.     An accounting and an award of damages pursuant to 35 U.S.C. § 284

adequate to compensate for Defendants' infringement of DoDots' patents-in-suit, and in

no event less than a reasonable royalty for Defendants' acts of infringement, including

all pre-judgment and post-judgment interest at the maximum rate permitted by law;

D.     A finding that this is an exceptional case under 35 U.S.C. § 285 entitling

DoDots to enhanced damages up to a trebling and an award of attorneys' fees;

E.     That Defendants be ordered to pay all of DoDots' costs associated with

this action; and

F.     Any other remedy to which DoDots may be entitled.


Dated: September 12, 2022               Respectfully submitted,

                                        */s/ Raymond W. Mort, III*
                                        Raymond W. Mort, III
                                        Texas State Bar No. 00791308
                                        raymort@austinlaw.com
                                        **THE MORT LAW FIRM, PLLC**
                                        100 Congress Ave, Suite 2000
                                        Austin, Texas 78701
                                        Tel/Fax: (512) 865-7950

                                        *Of Counsel:*
                                        Ronald M. Daignault (*pro hac vice*)*
                                        Chandran B. Iyer (*pro hac vice*)
                                        Shalu Maheshwari (*pro hac vice*)*
                                        Richard Juang (*pro hac vice*)*
                                        Oded Burger (*pro hac vice*)*
                                        Zachary H. Ellis (State Bar No. 24122606)*
                                        rdaignault@daignaultiyer.com
                                        cbiyer@daignaultiyer.com
                                        smaheshwari@daignaultiyer.com

rjuang@daignaultiyer.com
oburger@daignaultiyer.com
zellis@daignaultiyer.com
**DAIGNAULT IYER LLP**
8618 Westwood Center Drive
Suite 150
Vienna, VA 22102
*\*Not admitted in Virginia*


Brian S. Seal (pro hac vice to be requested)
**TAFT STETTINIUS & HOLLISTER LLP**
200 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Tele: (202) 664-1537
bseal@taftlaw.com

**ATTORNEYS FOR PLAINTIFF**